UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JASON CATO,                                              **DECISION AND ORDER**
                                                         **No. 04-CV-0985(VEB)**
                              Petitioner,

        -vs-

SUPERINTENDENT OF THE GROVELAND
CORRECTIONAL FACILITY,

                              Respondent.
_____

## INTRODUCTION

Petitioner, Jason Cato ("Cato"), filed this *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254. He is challenging two convictions involving drug crimes in

Ontario County Court, one following a jury trial on August 31, 2001, and one entered pursuant to

a guilty plea on October 9, 2001. The parties have consented to disposition of this matter by the

undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The convictions here at issue stem from Cato's alleged involvement in a series of drug

sales which occurred between July 24, 2000, and February 21, 2001, in the City of Geneva. On

May 18, 2001, Cato was arraigned on indictment number 01-04-057 which charged him with six

counts of criminal sale of a controlled substance in the third degree ("CSCS3"), one count of

criminal possession of a controlled substance in the third degree ("CPCS3"), and seven counts of

criminal possession of a controlled substance in the seventh degree ("CPCS7").[1] This thirteen-count indictment covered transactions alleged to have occurred on July 24, 2000; January 18, 2001; January 22, 2001; February 8, 2001; February 15, 2001; and February 21, 2001. Ontario County Court dismissed the three counts pertaining to the February 8, 2001 transaction.[2] Cato went to trial on the remaining ten counts and, on August 31, 2001, the jury returned a verdict convicting him of eight of those counts. (He was acquitted of the two charges pertaining to the July 24, 2000 transaction.)

The prosecutor re-presented the charges stemming from the February 8th transaction which had been dismissed by the trial court and, on September 20, 2001, the grand jury handed down indictment number 01-07-117, charging Cato with one count of CSCS3, one count of CPCS3, and one count of CPCS7. Cato was arraigned on October 9, 2001, while he was awaiting sentencing on his convictions entered after the jury trial. The judge advised Cato that if he pled guilty to the charges in indictment number 01-07-117, the possible sentence would be capped at ten to twenty years and would run concurrently to the sentences Cato would receive on his other convictions. R.0034.[3] After conferring with Cato, defense counsel reiterated the trial court's sentence promise for the record and indicated that Cato would plead guilty. R.0035-36. Cato then allocuted to the charges contained in indictment number 01-07-117. R.0045-46. At that time, Cato was sentenced on his trial convictions to concurrent terms of eight and one-half to

---

[1]    Third degree criminal sale of a controlled substance and third degree criminal possession of a controlled substance are class B felonies. *See* N.Y. Penal Law §§ 220.16, 220.39. Seventh degree criminal possession of a controlled substance is a class A misdemeanor. *See* N.Y. Penal Law 220.03.

[2]    Count seven (CSCS3), count eight (CPCS7), and count thirteen (CSCS3).

[3]    Citations to "R._" refer to respondent's exhibits, which are Bates-stamped and contained in two volumes.

seventeen years on each felony conviction. R.1139-1141.

On October 19, 2001, Cato appeared for sentencing on his convictions that had been entered pursuant to a guilty plea on October 9th. At this time, Cato (acting *pro se*) moved to withdraw his plea, claiming that he had been promised, off the record, a sentence of seven to fourteen years. R.0053-56. The trial court denied his motion and sentenced him to a term of eight and one-half to seventeen years, to run concurrently with the sentences he had received on his trial convictions. R.0061-62.

Cato appealed both sets of convictions to the Appellate Division, Fourth Department, of New York State Supreme Court, which unanimously upheld them. *People v. Cato*, 306 A.D.2d 912, 761 N.Y.S.2d 909 (App. Div. 4th Dept. 2003). Cato moved for reargument which was denied. Leave to appeal to the New York Court of Appeals was denied with respect to all of the Fourth Department's decisions.

Cato then filed a motion for *vacatur* pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. R.1162-74. Ontario County Court denied the motion. R.1206-08. Leave to appeal to the Appellate Division was denied. R.1217. This timely habeas petition followed in which Cato asserts the following grounds for relief: (1) the trial court committed reversible error "by failing to preempt for cause prosecution oriented unfair potential jurors"; (2) the trial court committed reversible error by failing to give a "missing witness" charge to the jury; (3) the trial court abused its discretion in its *Sandoval* ruling;[4] and (4) "involuntary guilty plea, unkept plea agreement and failure of lower court fo fulfill sentence as promised." Petition, ¶¶12(a) - (d)

---

[4]        A hearing was held pursuant to *People v. Sandoval*, 34 N.Y.2d 371 (1974), to determine the extent to which Cato–should he decide to testify–could be cross-examined regarding prior crimes and bad acts bearing on his credibility, veracity or honesty.

(Docket No. 1). Respondent answered the petition and interposed the defenses of non-exhaustion and procedural default with respect to grounds two and three. *See* Respondent's Memorandum of Law ("Resp't Mem.") at 4-5 (Docket No. 11).

For the reasons set forth below, the petition is dismissed.

## DISCUSSION

### Exhaustion and Procedural Default

As respondent correctly notes, it is well-settled that in order to obtain a writ of habeas corpus, a petitioner must have exhausted his available state court remedies with respect to his constitutional claims. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512, 30 L. Ed.2d 438 (1971); *Grey v. Hoke*, 933 F.2d 117, 119-21 (2d Cir. 1991). The exhaustion requirement extends to every federal claim asserted by a petitioner. *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994). However, federal courts now have the discretion to deny on the merits a petitioner's unexhausted claims. *See* 28 U.S.C. § 2254(b).

In particular, the exhaustion doctrine "requires . . . that state prisoners give state courts a fair opportunity to act on their claims." *O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S. Ct. 1728, 144 L. Ed.2d 1 526 U.S. at 844 (citing 28 U.S.C. § 2254(c)) (additional citations omitted). Thus, a petitioner is not deemed to have exhausted the available state remedies if he or she has the right under state law to raise, by any procedure, the federal question presented in his or her habeas petition. 28 U.S.C. § 2254(c). The Supreme Court has interpreted this as requiring petitioners to invoke of "one complete round of the State's established appellate review process," including an application to "a state court of last resort when that court has discretionary control over its docket." *O'Sullivan*, 526 U.S. at 843, 845.

Thus, the exhaustion requirement is not satisfied until the petitioner has "fairly presented" the federal claim to the highest court of the state. *See Picard*, 404 U.S. at 275 ("We emphasize that [for purposes of exhaustion] the federal claim must be fairly presented to the state courts."). A claim may be "fairly presented" to the state courts if "the legal basis of the claim made in state court was the 'substantial equivalent' of that of the habeas claim." *Daye Attorney General of New York*, 696 F.2d 186, 192 (2d Cir. 1982) (quoting *Picard*, 404 U.S. at 278) (additional citations omitted). "This means, in essence, that in state court the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* Additionally, a habeas petitioner may "fairly present" his or her federal claims "even without citing chapter and verse of the Constitution," by the following four methods, first summarized by the Second Circuit in *Daye v. Attorney General of New York*: (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *Daye*, 696 F.2d at 194.

Respondent argues that Cato failed to exhaust his claim regarding the failure to issue a missing witness charge because, although petitioner argued in his Appellate Division brief that the trial court erroneously failed to deliver a missing witness charge, the claim was not presented to the state courts in "federal constitutional terms." Respondent's argument has some force; however, in the interest of judicial economy, the Court will consider Cato's claim on the merits. As discussed more fully *infra*, the claim does not provide a basis for habeas relief.

Respondent also raises the defense of non-exhaustion with regard to Cato's claim that the

trial court erred in its *Sandoval* ruling, arguing that the claim was not presented in federal

constitutional terms when it was raised on direct appeal. Resp't Mem. at 6 (Docket No. 11).

Respondent further notes that, in any event, a *Sandoval* claim is an evidentiary issue and, as such,

is purely a matter of state law. *Id.* The Court need not decide whether Cato's *Sandoval* claim has

been properly exhausted because, as respondent argues later in its memorandum of law, it is not

cognizable on federal habeas review due to Cato's failure to testify at trial. *See Grace v. Artuz*,

258 F. Supp.2d 162, 171-72 (E.D.N.Y. 2003) (in absence of petitioner taking the stand to testify

at trial, "petitioner's claim as to the impropriety of the *Sandoval* ruling [did] not raise a

constitutional issue cognizable on habeas review") (citing *Carroll v. Hoke*, 695 F. Supp. 1435,

1440 (E.D.N.Y. 1988) *aff'd*, 880 F.2d 1318 (2d Cir. 1989) (citing *Luce v. United States*, 469 U.S.

38, 43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (holding that in order "to raise and preserve for

review the claim of improper impeachment with a prior conviction, a defendant must testify"));

*accord Brathwaite v. Duncan*, 271 F. Supp.2d 400, 401 (E.D.N.Y. 2003) (holding that *Sandoval*

claim not cognizable on federal habeas review where petitioner did not testify at trial).

## **Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death

Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must

demonstrate that the state court's adjudication of his Federal constitutional claim resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

**1.      Trial court error in denying petitioner's challenges for cause regarding two jurors**

Cato states in his petition that "unfair potential jurors failed to set aside biases or predispositions. Thus, 'if there is any doubt about a prospective Juror's impartiality, Trial Court should err on the side of excusing the Juror." Petition, ¶12(A) (Docket No. 1). As respondent points out, Cato does not indicate to which jurors he is referring. The Court agrees with respondent's assumption that Cato is referring to Juror Six and Juror Seven from the first panel, which are the two jurors about which appellate counsel raised a claim of partiality on direct appeal, arguing that the trial court erred in denying defense counsel's challenges for cause as to those two jurors. *See* Resp't Mem. at 8 (Docket No. 11).

As a threshold matter, the Court notes that a trial judge's decision with respect to a challenge for cause is entitled to substantial deference and may be overturned only for manifest error. *Irvin v. Dowd*, 366 U.S. 717, 723-24, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *accord Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Although Juror Six expressed strong "anti-drug" sentiments, he ultimately stated that he would not allow those views to affect his evaluation of the evidence. Juror Seven informed the trial court that she was married to a police officer and felt that when the police arrest someone, they have a reason for it. However, she stated that she did not believe that merely because someone was arrested meant that person was guilty. When asked by the prosecutor if she agreed that the defendant was entitled to a "not guilty" verdict if he did not meet his burden of proof, Juror Seven replied, "Oh, yeah."  Both Juror Six and Juror Seven thus provided assurances of their abilities to be impartial. The Court accordingly is not convinced that it was "manifestly erroneous" for the trial court to

decline to excuse these potential jurors for cause. In any event, these jurors were not seated on

Cato's jury, as they were struck by defense counsel using his peremptory challenges.

   To the extent that Cato may be claiming that he was wrongly forced to exercise

peremptory challenges to remove jurors who allegedly should have been excused for cause, he

has not articulated a claim of federal constitutional dimension. *E.g.*, *United States v.*

*Martinez-Salazar*, 528 U.S. 304, 305, 120 S.Ct. 774, 776, 145 L.Ed.2d 792 (2000) (holding that

neither the Sixth Amendment nor Due Process was violated where defendant peremptorily

challenged juror who should have been excused for cause and thereafter exhausted his

peremptories). The Supreme Court has "long recognized that peremptory challenges are not of

constitutional dimension. . . . So long as the jury that sits is impartial, the fact that the defendant

had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment

was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988)

("Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's

error [in denying his challenge for cause]. But we reject the notion that the loss of a peremptory

challenge constitutes a violation of the constitutional right to an impartial jury."); *accord*, *e.g.*,

*United States v. Towne*, 870 F.2d 880, 885 (2d Cir.) (absent showing of partiality on part of jury

that ultimately convicted him, defendant "may not successfully claim deprivation of his sixth

amendment or due process rights"), *cert. denied*, 490 U.S. 1101, 109 S.Ct. 2456, 104 L.Ed.2d

1010 (1989); *United States v. Morales*, 185 F.3d 74, 84 (2d Cir. 1999), *cert. denied*, 529 U.S.

1010, 120 S.Ct. 1282, 146 L.Ed.2d 229 (2000).

   Here, Cato cannot demonstrate that his Sixth Amendment rights were violated by the trial

judge's refusal to excuse Jurors Six and Seven for cause, since neither juror was a member of the

jury that convicted him. *See Ross v. Oklahoma*, 487 U.S. at 88 (citing *Hopt v. Utah*, 120 U.S. 430, 436, 7 S.Ct. 614, 616, 30 L.Ed. 708 (1887); *Spies v. Illinois*, 123 U.S. 131, 8 S.Ct. 21, 22, 31 L.Ed. 80 (1887)); *United States v. Towne*, 870 F.2d at 885. Since Cato has never suggested, let alone established that the jury which ultimately convicted him was in any way partial or biased, he may not successfully claim deprivation of his Sixth Amendment or Due Process rights. *E.g.*, *Towne*, 870 F.2d at 885 (citing *United States v. Brown*, 644 F.2d 101, 104 (2d Cir.) ("The absence of proof here that the jury that heard Brown's case was in fact partial precludes the defendant from successfully claiming a deprivation of due process."), *cert. denied*, 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981). Thus, as a matter of federal habeas law, Cato's claim regarding the trial court's denials of his for-cause juror challenges must be denied.

**2.     Trial court error in failing to issue "missing witness" jury instruction**

Cato argues that the trial court erred in declining to give a missing witness instruction to the jury with respect to the buyer involved in the February 15, 2001 drug sale. On direct appeal, the Fourth Department held that "[e]ven assuming, *arguendo,* that the court erred in failing to give the charge, we conclude that the error is harmless inasmuch as '[t]he proof of guilt is overwhelming, and there is no significant probability that defendant would have been acquitted but for the error[.]'" *People v. Cato*, 306 A.D.2d at 913 (alteration in original) (citations omitted).

As a matter of both state and federal evidentiary law, the rule is well-settled that "a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse." *Revson v. Cinque & Cinque*, P.C.221 F.3d 71, 82 (2d Cir. 2000) (citing *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)

(1893) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.")). The New York Court of Appeals has set forth a framework for determining when a party is entitled, as a matter of law, to such a missing witness charge. Initially, the party seeking the missing witness charge must sustain a burden of showing that the opposing party has failed to call a witness who could be expected to have knowledge regarding a material issue in the case and to provide testimony favorable to the opposing party. *People v. Gonzalez*, 68 N.Y.2d 424, 509 N.Y.S.2d 796, 502 N.E.2d 583, 586 (N.Y.1986).  The burden then shifts to the opposing party, "to account for the witness' absence or otherwise demonstrate that the charge would not be appropriate. This burden can be met by demonstrating that the witness is not knowledgeable about the issue, that the issue is not material or relevant, that although the issue is material or relevant, the testimony would be cumulative to other evidence, that the witness is not 'available,' or that the witness is not under the party's 'control' such that he would not be expected to testify in his or her favor." *People v. Macana*, 84 N.Y.2d 173, 615 N.Y.S.2d 656, 639 N.E.2d 13 (N.Y.1991) (quoting *People v. Gonzalez*, 68 N.Y.2d 424, 502 N.E.2d at 586 (further citations omitted)).

Here, the missing witness was a man named George Parker ("Parker"). Parker's name came up at trial during the testimony given by Brenda Pesante[5] ("Pesante") and Officer Middlebrook regarding the February 15, 2001 drug sale. Pesante testified for the prosecution that

---

[5]     Brenda Pesante testified that on this date, she was not working for the police as a confidential informant. T.106 (R.0774). Officer Middlebrook subsequently went to her apartment and spoke to her about the incident; she admitted on cross-examination that he told her that he could arrest her on a drug possession or drug sale charge if she did not cooperate with him. T.111 (R.0779).

-10-

on that date she facilitated a drug sale between Cato and a black male in the parking lot of Al's

Inn in the City of Geneva. Pesante testified that she "talked to this black guy" who said "he

wanted some stuff[,]" specifically, "two bags" for "[f]orty bucks." At that time, Cato came out of

the bar, and Pesante informed Cato of the man's request. According to Pesante, Cato told her that

he "didn't want to speak to the guy" because "[h]e didn't know the guy."  Pesante then "just went

and told the boy . . . that [Cato] didn't know him" and would not speak with him. Parker "gave

[Pesante] forty bucks" to give to Cato, which she did. Cato in turn gave Pesante two bags of

crack cocaine. When asked where Cato got the bags from, Pesante replied, "Geez, his zipper."

Officer Middlebrook testified that he observed the transaction involving Pesante, Cato,

and the unknown black male. After it was completed, Officer Middlebrook stopped the black

male, whom he did not know, and checked him for identification. The man produced a Virginia

photographic identification card indicating that his name was George Parker. Officer

Middlebrook confiscated a bag of cocaine from him, charged him with CPCS7, and gave him an

appearance ticket. When the prosecutor attempted to question Officer Middlebrook about

whether Parker had appeared in court pursuant to the ticket, defense counsel successfully

objected and broached the subject of a missing witness charge with the trial court.

During the charge conference, defense counsel again requested a missing witness

instruction with regard to Parker. The trial court determined that defense counsel had met his

initial burden, shifting the burden to the prosecution to demonstrate that the witness in fact was

unavailable. T.310 (R.0978). Therefore, the trial court ordered that Officer Middlebrook be re-

called in order to give testimony as to Parker's availability.

Officer Middlebrook testified outside the presence of the jury that when he had detained

Parker, Parker said that "he intended on moving back to Virginia, he was not sure when." T.312 (R.0980). Parker did not give an address in Virginia. *Id.* Officer Middlebrook took down the address in the City of Geneva where Parker indicated he was staying at the time. Apparently, Officer Middlebrook saw Parker on the street a couple of weeks after the drug sale, but Parker did not appear as scheduled in Geneva City Court pursuant to the misdemeanor appearance ticket issued by Officer Middlebrook. Thereafter, a warrant was issued with respect to Parker; it was outstanding at the time of trial. T.313 (R.0981). In April 2001, Officer Middlebrook attempted to serve a grand jury subpoena on Parker at the Geneva address, but he did not find Parker there. *Id.* Officer Middlebrook interviewed the landlord and the tenants on both sides of Parker's old apartment. He also utilized his "street contacts" in an attempt to locate Parker. T.313-14 (R.0981-82). These efforts were unsuccessful. When the trial subpoenas were issued, Officer Middlebrook again attempted to locate Parker; however, the apartment where Parker had been staying had been rented to a new tenant and none of the neighbors knew of Parker's whereabouts. T.314 (R.0982). Officer Middlebrook stated that he also had other officers in Geneva looking for Parker but it was to no avail. *Id.*

On cross-examination, when asked whether the Virginia identification card had an address on it, Officer Middlebrook stated that he did not recall. T.315 (R.0983). When asked whether it was a driver's license, the officer testified that he recalled it as being a "photo ID." He stated that he took down the address in Geneva where Parker was staying. *Id.* Officer Middlebrook admitted that he did not contact the jails in the counties contiguous to Ontario County, but he also stated it would have been common to receive notification from them if they had processed an individual with a pending Geneva arrest warrant. T.317-18 (R.0985-86).

Officer Middlebrook testified that his department received no such notification.

After hearing Officer Middlebrook's testimony and argument from counsel, the trial court determined that Parker was "indeed unavailable" and therefore the missing witness charge was not warranted. T.340 (R.1008). As mentioned above, on direct appeal, the Appellate Division held that "[e]ven assuming, *arguendo*, that the court erred in failing to give the charge, . . . the error is harmless inasmuch as '[t]he proof of guilt is overwhelming, and there is no significant probability that defendant would have been acquitted but for the error[.]'" *People v. Cato*, 306 A.D.2d at 913 (quotation and citations omitted).

The Court observes that under New York state law, "[a]n out-of-state witness is not necessarily unavailable[.]" *People v. Jackson*, 122 A.D.2d 566, 504 N.Y.S.2d 953, 953 (App. Div. 4th Dept. 1986) (citing *People v. Jenkins*, 41 N.Y.2d 307, 310 n 2, 392 N.Y.S.2d 587, 360 N.E.2d 1288 (N.Y. 1977), *rearg. denied*, 42 N.Y.2d 825 (N.Y. 1977)). Moreover, "the mere fact of absence from the State does not negate control," since "[t]here is a procedure available to the prosecution for the production of an out-of-state witness," namely, New York Criminal Procedure Law § 640.10, known as the Uniform Act to Secure Attendance of Witnesses from Without the State in Criminal Cases. *Id.* (citation omitted). Appellate counsel argued that the procedure was available in Parker's case since Virginia has a procedure "recognizing and effectuating the State of New York's right to secure witnesses in criminal proceedings." Defendant's Appellate Brief at 37 (R.0238) (citing Virginia Code of Criminal Procedure, Title 19.2, Chapter 16).

In *People v. Jackson*, the Appellate Division reversed the defendant's conviction based on the trial court's refusal to issue a missing witness charge where the witness in question was in

-13-

Florida (at an address known to the People) and under the People's control since she had testified at a preliminary hearing and before the Grand Jury and supplied a statement for the pre-sentence investigation. Because she was "available" pursuant to C.P.L. § 640.10 and her testimony was material and non-cumulative, the trial court erred in refusing the request for a missing witness charge. *Id.* The court in *Jackson* held that the error could not be considered harmless since "the proof against defendant was not overwhelming[.]" *Id.*

Viewing Cato's claim against this New York state precedent, it appears that he had a colorable argument regarding Parker's availability and that he therefore was entitled to the charge. Certainly, the police officer who issued an appearance ticket to Parker should have attempted to ascertain Parker's legal residence or asked if there was an address in Virginia to which he planned to return. Regrettably, this was not done. However, it is not clear that the trial court erred as a matter of New York state law in finding that Parker was "unavailable" since the prosecution did not know for certain whether Parker actually had left New York state and returned to Virginia. *Cf. People v. Alamo*, 63 A.D.2d 6, 8, 406 N.Y.S.2d 787, 789 (App. Div. 1st Dept. 1978) ("Despite the assertion that the prosecutor did not know the informant's whereabouts, it appears that the prosecutor knew that the informant had left New York and was now in another state. Only his whereabouts in that state were allegedly unknown. There was no showing that a diligent effort was made to ascertain his whereabouts and to produce him to testify at trial.").

Nevertheless, even if the trial court erred as a matter of state law in finding that Parker was "unavailable" for purposes of declining to issue a missing witness instruction, such error alone is insufficient to support the issuance of a writ of habeas corpus for it is not the province of

-14-

a federal habeas court to "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Rather, Cato must show that there was an error of federal constitutional law. The Court notes that in the context of federal criminal trials, the Second Circuit has held that "[w]hether a missing witness charge should be given lies in the sound discretion of the trial court." *United States v. Torres*, 845 F.2d 1165, 1171 (2d Cir. 1988) (citing *United States v. Miranda*, 526 F.2d 1319, 1330-31 (2d Cir. 1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *United States v. Cotter*, 60 F.2d 689, 691-92 (2d Cir.) (Hand, J.), *cert. denied*, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932)); *accord, e.g.*, *United States v. Abelis*, 146 F.3d 73, 84 (2d Cir. 1998). Furthermore, the "availability" analysis under federal law in this Circuit is somewhat different than that under New York state law. *See Torres*, 845 F.2d at 1170 ("The weight of authority indicates that 'in the context of the evidentiary inference to be drawn from a party's failure to call an available witness, the "availability" of a witness . . . depend[s] . . . on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility.'") (quoting *United States v. Rollins*, 487 F.2d 409, 412 (2d Cir. 1973)). Under this precedent, then, the question is whether the trial court abused its discretion in declining to issue the charge. Using *Torres* for guidance, the Court cannot conclude that this was the case here. *See id.* at 1170-71 ("Even assuming that the facts and circumstances of Fornier's relationship with the government were sufficient to render him practically unavailable to the defense, we see no reversible error in [the district court's] failure to give a missing witness instruction solely against the government, especially given that the judge permitted defense counsel to argue the inference themselves in summation."). Cato's defense counsel was not prevented from arguing the inference during his

summation; he mentioned that the prosecution had stated during opening argument that Parker

was the buyer in the February 15th transaction, but Parker "didn't come before you [the jury] to

talk so we don't know that. All we know is what Brenda Pesante said happened and what Officer

Middlebrook witnessed from several feet away[.]" T2.15-16 (R.1037-38). Under these

circumstances it would be "rare" for a federal trial judge to give a missing witness charge.

*Morales v. Strack*, Nos. 99-CV-1617 (JBW), 03-MISC-0066 (JBW), 2003 WL 21816963, at *4

(E.D.N.Y. July 3, 2003).

Even if there was error in this regard, both New York and federal law subject such errors

to review for harmlessness. Where, as here, a state court has explicitly conducted harmless-error

review, the Second Circuit has directed that under AEDPA, a habeas court must evaluate whether

the state "unreasonably applied" the standard set forth in *Chapman . California*, 386 U.S. 18, 24,

87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[6] *Gutierrez v. McGinnis*,  389 F.3d 300, 306 (2d Cir. 2004).

Here, Pesante testified that as she was entering Al's Inn on the night of February 15th, she was

approached by Parker who said that he wanted some "stuff." At that moment, Cato exited Al's

Inn, and Pesante spoke to him about Parker's request. She then gave Cato the forty dollars given

to her by Parker, and Cato removed a package of crack cocaine from pants-zipper area and

handed it to her. Officer Middlebrook, who was monitoring the parking lot behind Al's Inn, saw

Cato remove a "white package out of his pants" and give it to Pesante who walked back over to

Parker and handed it to him. T.208 (R.0876). Officer Middlebrook testified that he "never lost

sight of [Parker]," T.228 (R.0896), and when he stopped him several moments later, he

---

[6]       In *Chapman*, the Supreme Court held that an error may be overlooked only if it is "harmless
beyond a reasonable doubt." 386 U.S. at 24.

recovered one bag of cocaine from him, T.209 (R.0877). It is true that Officer Middlebrook could not identify the contents of the package from his vantage point. However, there was no testimony that Pesante or anyone else also had sold drugs to Parker, and Officer Middlebrook confiscated only one bag of crack cocaine from Parker. Arguably, Parker's testimony would have been cumulative, since Pesante provided detailed testimony as to the cocaine transaction and was subjected to extensive cross-examination.

Given the substantial evidence of guilt and the fact that the defense was allowed to argue the adverse inference on summation, it was reasonable for the Appellate Division to conclude that any error in failing to give the requested missing witness charge was harmless beyond a reasonable doubt. Accordingly, habeas relief is not warranted on this claim.

**3.      Involuntariness of petitioner's guilty plea due to breach of off-the-record sentence promise**

Finally, Cato assails the conviction entered pursuant to his guilty plea on October 9, 2001, on the grounds that it was involuntary. In particular, Cato contends that he had been made an "off the record" sentence promise of five to ten years[7] which was subsequently breached when the court sentenced him to a term of eight and one-half to seventeen years. *See* Petition, ¶12(D) (Docket No. 1).

Cato raised this claim in a *pro se* supplemental brief on direct appeal; the Appellate Division summarily dismissed the contention as without merit. Reviewing the record, it appears that early on in the proceedings, the prosecutor had offered Cato a plea deal with a sentence promise of five to ten years. At a hearing held on April 13, 2001, the trial court reiterated the

---

[7]      Curiously, Cato claimed in his state-court motion to withdraw the plea that the alleged off-the-record sentence promise was a sentence cap of seven to fourteen years.

proposal it had made in a screening conference on March 23, 2001: if Cato "were to waive indictment and plead guilty to thirteen counts in a Superior Court information, that the indicated sentence, assuming that the Defendant were found to be a second felony offender, would be five to ten years." 4/13/01 Tr. at 2 (R.0300). Defense counsel clarified that "[t]he deal was he would plead to the seven felony counts [in the thirteen-count indictment] in satisfaction." *Id.* The trial court agreed. *Id.* Cato indicated that he was not prepared to waive indictment and plead guilty at that time. *E.g.*, 4/13/01 Tr. at 7 (R.0305). The trial court then clearly indicated that the offer was "off the table and the matter [was] . . . in the hands of the People to present it to the grand jury." *Id.* at 6 (R.0304).

Cato was indicted on May 25, 2001. A subsequent plea offer with a sentence promise of five and one-half to eleven years was made; it would have required Cato to plead guilty to the indictment and to waive his right to appeal. On August 27, 2001, two days before trial was scheduled to begin, Cato rejected this offer as well. 8/27/01 Tr. at 3 (R.0387). The trial court confirmed that Cato understood that "that offer will not be placed on the table again." *Id.* and confirmed that he wished to proceed to trial.

Thus, at the time that Cato entered his guilty plea on October 9, 2001, it is clear that these two prior offers were "off the table" and were no longer available to him. Moreover, at no point during the October 9th hearing did any of the parties express any understanding that a sentence promise of five to ten years was still under consideration:

The Court:                    There are actually two matters on our agenda today.
                              We did discuss these matters in chambers this
                              morning and the Court wishes to first talk about
                              indictment 1-7-117. The Court indicated that it
                              would cap the sentence upon that indictment to an

> indeterminate term, maximum period of which is twenty years, minimum period of which is ten years and the Court would also agree if he were to plead, if the defendant were to plead guilty[,] the Court agreed to make that time concurrent with the sentence which would be pronounced with regard to the other matter on our agenda today, which is indictment 01-04-057. Is that everybody's understanding of our discussion this morning?

Mr. Ritts [the prosecutor]: It is, your Honor.

Mr. Jones [defense counsel]: Yes, Judge, it is, although I have not seen the new indictment yet.

10/09/01 Arraignment and Plea Transcript at 2 (R.0034). As respondent points out, from the outset, the understanding placed on the record was that the trial court would cap the sentence at ten to twenty years, not five to ten years.

The trial court proceeded to read the new indictment, which was the result of the prosecutor having re-presented the evidence concerning the February 8th incident. After being asked how Cato wished to proceed on that indictment, defense counsel replied as follows: "Judge, based on the understanding that your Honor placed on the record indicating a maximum sentence of ten to twenty years concurrent with whatever the sentence would be on the other matter, we are set for – with regard to sentencing on the trial. My client is prepared to enter a plea to these three counts of the indictment." 10/09/01 Tr. at (R.0035-36).

Finally, during his allocution, Cato confirmed that he understood that the sentence promise was a maximum of twenty years and a minimum of ten years:

The Court: Now, is it your – has anyone threatened you, coerced you or forced you to plead guilty?

Mr. Cato: No.

The Court: Are you doing so of your own freewill, voluntarily?

Mr. Cato:      Yes.
The Court:     Okay. And has anyone promised you anything other than the
               indicated sentence in order to induce your plea of guilty?
(Mr. Cato consulted with Mr. Jones [defense counsel].)
Mr. Jones:     He is just referring to the indicated sentence, Judge.
The Court:     Which is a cap of maximum twenty, minimum ten. Indeterminate
               term, maximum twenty, minimum ten. That's the cap that I have
               given you with regard to this offense. Has anyone promised you
               anything else other than that in order to get you to plead guilty
               other than the fact that that time would be served concurrently with
               the time imposed on the other matter pending before this Court?
               Anything else been promised to you?
Mr. Cato:      No.

10/09/01 Tr. at (R.0039-40).

Cato's sworn statements at the time of his guilty plea are entitled to far greater weight

than his after-the-fact, self-serving assertions to the contrary. *See Blackledge v. Allison*, 431 U.S.

63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The

subsequent presentation of conclusory allegations unsupported by specifics is subject to summary

dismissal, as are contentions that in the face of the record are wholly incredible."); *accord*, *e.g.*,

*United States v. Diaz*, 176 F.3d 52, 115 (2d Cir. 1999). Here, there is nothing in the record to

substantiate Cato's claim and, in fact, Cato's sworn statements during his plea hearing directly

contradict his claim of an involuntary guilty plea based on a misunderstanding about an alleged

off-the-record sentence promise. That Cato stated in open court that the only sentence promised

to him was between ten and twenty years undercuts his assertion, made for the first time after

sentencing, that there was any kind of "side deal" in which he had been promised a lesser

sentence. In short, Cato's allegations merely contradict the record and are an insufficient basis on

which to find that his guilty plea was anything but knowing and voluntary. *See United States v.*

*Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992) ("No hearing need be granted when the allegations

-20-

on a motion to withdraw a guilty plea before sentencing merely contradict the record, are

inherently incredible, or are simply conclusory.") (citations omitted).

## CONCLUSION

For the foregoing reasons, petitioner Jason Cato's request for a writ of habeas corpus is

denied and the petition is dismissed. Because petitioner has failed to make a substantial showing

of a denial of a constitutional right, the Court declines to issue a certificate of appealability. *See*

28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      November 30, 2006
            Buffalo, New York.